UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JULIUS HOUSTON,

Defendant.

CRIMINAL ACTION NO.

1:25-CR-267-SEG-JSA

## **O R D E R**

This matter is before the Court on the Magistrate Judge's Report and Recommendation ("R&R") concerning Defendant's motion to suppress the search of his baggage and motion to suppress his statements. (Doc. 58.) The Magistrate Judge recommends that both motions be denied. (*Id.*) Defendant has filed objections to the Magistrate Judge's R&R. (Doc. 63.) After careful consideration, the Court enters the following order.

### I. Background

On June 11, 2025, a grand jury returned an indictment charging Julius Houston with (1) knowingly possessing a "concealed dangerous weapon, that is, a Heritage Barkeep .22 caliber pistol, which would have been accessible to him during flight," when attempting to board a Spirit Airlines aircraft, in violation of 49 U.S.C. § 46505(b)(1) (Count One); and (2) knowingly and willfully entering an airport area with intent to evade security procedures and

restrictions, by possessing a "firearm" while entering an airport security checkpoint area, in violation of 49 U.S.C. § 46314(a) and (b)(2) (Count Two). The offenses are alleged to have occurred on November 8, 2022.  (Doc. 1.)

Mr. Houston moves to suppress the search of his baggage.  (Doc. 20.)  He further moves to suppress all statements made by him on November 8, 2022, on the ground that his statements were elicited by law enforcement officers during a custodial interrogation in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  (Doc. 12.)  After conducting an evidentiary hearing (Doc. 41), the Magistrate Judge issued an R&R in which he recommended that both motions be denied (Doc. 58), to which Mr. Houston has objected (Doc. 63.)

The factual background concerning the search of Mr. Houston's baggage and the circumstances of his questioning by police are set forth in the Magistrate Judge's R&R.  (Doc. 58 at 1-3.)  In addition, the Court has independently reviewed the record in this case including the transcript of the evidentiary hearing and body-worn camera ("BWC") footage submitted by the parties.  (*See* Doc. 41, 76, 77.)  The Court discusses relevant facts within its legal analysis and notes disagreements with the Magistrate Judge's factual findings where pertinent.

## II. Legal Standard

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a de novo review of those portions of the R&R to which Defendant has timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667 (1980). For a party's objections to warrant de novo review, he "must clearly advise the district court and pinpoint the specific findings that [he] disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009). "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). Those portions of the R&R to which there are no objections will be assessed for clear error only. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) ("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard.") (quoting 28 U.S.C. § 636(b)(1)).

3

## III.    Discussion

### A. Motion to Suppress Evidence

Mr. Houston moves to suppress the discovery by TSA officers of a firearm hidden in a game console that Mr. Houston allegedly tried to pass through a secure airport checkpoint on his way to board a flight.  (Doc. 20.)  However, as the Magistrate Judge correctly determined, Defendant's Fourth Amendment argument concerning the search and seizure of his game console and firearm is foreclosed by binding case law.  (Doc. 58 at 4-5.)  Defendant's objections do not persuasively challenge the Magistrate Judge's analysis; instead, Defendant objects generally to the "determination that the administrative search exception to the warrant requirement applies under the circumstances of this case . . . ."  (Doc. 63 ¶ 5.)

The Eleventh Circuit has long held that "airport security checkpoints, like international borders, are 'critical zones' in which special [F]ourth [A]mendment considerations apply."  *United States v. Lopez-Pages*, 767 F.2d 776, 778 (11th Cir. 1985).  Airport screenings, like the one that occurred in this case, generally constitute "reasonable administrative search[es] under the Fourth Amendment."  *Corbett v. Transportation Sec. Admin.*, 767 F.3d 1171, 1179-80 (11th Cir. 2014) ("The scanners at airport checkpoints are a reasonable administrative search because the governmental interest in preventing

4

terrorism outweighs the degree of intrusion on [defendant's] privacy and the scanners advance that public interest."); *see also Lopez-Pages*, 767 F.2d at 778 ("Airport authorities . . . are justified in 'undertaking a search with sufficient scope to reveal any object or instrumentality that [the passenger] could reasonably have used to effect an act of air piracy.'") (quoting *United States v. Skipwith*, 482 F.2d 1272, 1277 (5th Cir. 1973)); *United States v. Rosario*, No. 1:10-CR-416-WBH-GGB, 2011 WL 4404128, at *5 (N.D. Ga. May 11, 2011), *report and recommendation adopted,* No. 1:10-CR-0416-WBH, 2011 WL 4404127 (N.D. Ga. Sept. 21, 2011), *aff'd,* 520 F. App'x 928 (11th Cir. 2013) ("[O]nce Defendant checked his bags at the airport, they were subject to administrative search.").

Further, the Eleventh Circuit has held that "passengers who voluntarily present themselves at airport security checkpoints automatically consent to a search of their carry-on articles." *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987); *United States v. Herzbrun*, 723 F.2d 773, 776 (11th Cir. 1984) ("Moreover, those presenting themselves at a security checkpoint thereby consent automatically to a search[.]"); *see also Corbett v. Transportation Sec. Admin.*, 568 F. App'x 690, 697 (11th Cir. 2014) (stating

5

that those who present themselves at an airport security checkpoint thereby consent to a search).[1]

In this case, the Government has presented evidence that, on November 8, 2022, Transportation Security Administration ("TSA") Officer Theodosia White was screening luggage at the x-ray machine at the main domestic checkpoint. (Transcript of January 21, 2026, Evidentiary Hearing, Doc. 41 at 7-8, 13-15.)[2] As she performed her duties, she noticed on the x-ray screen what appeared to be a game console with a gun inside it. (*Id.* at 7, 13-16, 20-21.) Officer White stopped the x-ray machine and summoned a co-worker to look at the screen and confirm her impression. (*Id.* at 16-17, 24-25.) Officer White then asked for a supervisor, who, after looking at the screen, summoned an Atlanta Police Department ("APD") officer from a booth near the checkpoint.

---

[1] Mr. Houston objects to the Magistrate Judge's indication that an "implied consent" theory, under cases like *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987), provides an alternative basis upon which the search and seizure in this case was reasonable. (Doc. 63 ¶ 6.) However, Mr. Houston does not explain why the Magistrate Judge was incorrect in this regard or provide any authority in support of his objection. Given the above-quoted language in *McKennon* and *Herzbrun*, the Court overrules this objection.

[2] The Court refers to the page numbers generated by CM-ECF, even when the internal pagination of a document differs.

(*Id*. at 16-17, 25-30.)  Per Officer White, an APD officer[3] arrived, observed the image on the screen, and agreed that it appeared to show a gun.  (*Id*. at 17, 30.)

The unidentified APD officer retrieved the bag in question from the belt, took it to a table, and opened it.  (*Id*. at 17, 30-32.)  The APD officer then removed an Xbox gaming console from the bag and asked for the console to be run through the x-ray machine again.  (Def's Ex. 3, Unidentified APD officer BWC Footage, Doc. 77-3 at 00:20:30-20:50.)[4]  After confirming that the x-ray machine showed that the firearm was concealed within the Xbox console, the APD officer asked Mr. Houston how the Xbox could be opened without breaking it.  (*Id*. at 00:20:50-22:00.)  The officer then proceeded to attempt to pry open the Xbox and confirm that there was a firearm wedged inside.  (*Id*. at 00:22:00-23:20.)  After facing some difficulty removing the firearm from the Xbox, the

---

[3] The parties do not identify the name of the APD officer stationed at the TSA security checkpoint.

[4] In citing the body-worn camera ("BWC") footage submitted by the parties, the Court refers to the timestamp in the top-right corner of the BWC footage.  This timestamp is formatted using the "ISO 8601" standard as follows: YYYY-MM-DD HH:MM:SS.  *See* Timestamp watermark for camera videos - Axon Evidence product guide, https://my.axon.com/s/article/Timestamp-watermark-for-camera-videos-Axon-Evidence-product-guide?language=en_US (last accessed March 25, 2026).  The "-0500" that appears at the end of the timestamp indicates that the time being displayed is 5 hours before Coordinated Universal Time ("UTC"), which corresponds with Eastern Standard Time ("EST") when daylight savings time is not in effect.  Thus, the timestamp "2022-11-08 00:20:30 -0500" indicates 30 seconds after 12:20 AM EST on November 8, 2022.

unidentified APD officer then called for additional APD officers to respond to the TSA security checkpoint. (*Id.* at 00:23:20-23:40.)

Shortly thereafter, two other uniformed APD officers—Officers Pierre[5] and Ubedullah Hussain—approached the security checkpoint. (*Id.* at 00:27:15-27:40.) After being debriefed by the unidentified APD officer, Officers Pierre and Hussain directed Mr. Houston to follow them to a police precinct within the airport. (*Id.* at 00:27:40-32:00.) Officer Pierre kept possession of the Xbox during the walk to the police precinct. (Def's Ex. 1, Ofc. Pierre BWC Footage, Doc. 77-1 at 00:31:30-36:30.) Upon arriving at the police station, the APD officers directed Mr. Houston to wait on a bench in the lobby of the precinct. (*Id.*) Officer Pierre then removed the firearm from the console and removed screws and wiring taped to the firearm in full view of Mr. Houston. (*Id.* at 00:36:30-46:00.)

In the Court's view, once the x-ray machine showed the outline of a firearm, officers on the scene acted reasonably and well within the bounds of the Fourth Amendment to remove the bag from the belt and conduct a further administrative search of its contents. *See Herzbrun*, 723 F.2d at 777 ("The inquiry is whether the officer, on the basis of the articulable facts at hand, had

---

[5] The parties do not identify Officer Pierre's first name.

reason to suspect that the defendant was carrying materials that could endanger the safety of a flight."); *United States v. Clay*, 638 F.2d 889, 892 (5th Cir. 1981) ("[T]he fact that the x-ray scan machine indicated Clay's shoulder bag contained an unidentifiable dark object created sufficient suspicion to justify a complete physical search of the luggage until the object was positively identified as harmless."); *United States v. Wehrli*, 637 F.2d 408, 409-10 (5th Cir. 1981) (upholding search of entire bag and seizure of cocaine at airport checkpoint after x-ray machine revealed "three shapes that might have been cylinders with attached wiring").

Furthermore, the Court agrees with the Magistrate Judge's analysis that the TSA and APD officers' actions to open the Xbox, retrieve the firearm, and remove the screws and wires attached to the firearm remained within the permissible scope of the administrative search—namely, to protect against threats to aviation.  (Doc. 58 at 5-7); *see Herzbrun*, 723 F.2d at 779 (noting airport police's interest in "deterring, identifying, and investigating those planning mischief aboard airplanes").  Upon encountering a firearm concealed within a gaming console in his carry-on baggage, TSA and APD officers "had reason to suspect that [Mr. Houston] was carrying materials that could endanger the safety of a flight" and "had a legitimate interest in making a

9

conclusive determination with respect to [Mr. Houston's] conduct and presence in the airport." *Herzbrun*, 723 F.2d at 777, 779.

Accordingly, the officers' actions to retrieve the firearm discovered in Mr. Houston's baggage were reasonable under the Fourth Amendment. Defendant's motion to suppress evidence is denied.

**B. Motion to Suppress Statements**

Defendant moves to suppress all statements he made to officers during the incident on the grounds that (1) he was not given *Miranda* warnings prior to being questioned and (2) his statements were not voluntary. (Doc. 12.) The Court addresses each argument in turn.

**1. Whether Defendant Was Entitled to *Miranda* Warnings**

The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), "the Supreme Court announced 'a prophylactic [rule] to protect against violations of the Self-Incrimination Clause.'" *United States v. Morgan*, 143 F.4th 1264, 1273 (11th Cir. 2025) (quoting *United States v. Patane*, 542 U.S. 630, 636 (2004)). *Miranda's* "universally recognized mandate . . . requires police to afford any individual who has become the object of custodial interrogation specific warnings regarding his or her right to counsel and to

remain silent." *United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982), *abrogation on other grounds recognized by United States v. Phillips*, 812 F.2d 1355 (11th Cir. 1987). "*Miranda*'s demands apply only to 'custodial interrogation[s].'" *Morgan*, 143 F.4th at 1273 (quotation omitted). "A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action." *Garcia v. Singletary*, 13 F.3d 1487, 1489 (11th Cir. 1994). "Words or actions constitute interrogation when, from the standpoint of an objective officer, they 'are reasonably likely to elicit an incriminating response from the suspect.'" *Morgan*, 143 F.4th at 1273 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

More specifically, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). Such a "coercive environment exists, . . . when a reasonable person would have understood that his freedom of action was 'curtailed to a degree associated with formal arrest.'" *United States v. Woodson*, 30 F.4th 1295, 1303 (11th Cir. 2022) (quoting *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010)). In determining whether a person was in custody within the meaning of *Miranda*, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a

11

reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (cleaned up). "To answer that question, [courts] examine 'all of the circumstances surrounding the interrogation,' including the location and duration of the questioning, statements made during the interview, the presence or absence of physical restraints, and whether the person was released after the interview." *Woodson*, 30 F.4th at 1303 (quoting *Howes*, 565 U.S. at 509); *see Luna-Encinas*, 603 F.3d at 881 ("[W]e consider the totality of the circumstances, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled[.]" (cleaned up)).

However, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). Sometimes, the circumstances of a detention—for instance, a brief traffic stop or *Terry* stop—may lack "the shock that very often accompanies arrest." *Howes*, 565 U.S. at 511, *see Woodson*, 30 F.4th at 1303. "This kind of shock, which follows when a person is 'cut off from his normal life and companions' and 'abruptly transported from the street into a police-dominated atmosphere,' can create pressure to speak, as one may 'hope that, after doing so, he will be allowed to leave and go home.'" *Woodson*, 30 F.4th at

12

1303 (quoting *Howes*, 565 U.S. at 511).  As such, courts must "ask[ ] the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes*, 565 U.S. at 509.  The "ultimate task, in sum, is to compare the interview environment at hand to 'the paradigmatic *Miranda* situation'—where 'a person is arrested in his home or on the street and whisked to a police station for questioning.'"  *Woodson*, 30 F.4th at 1303.

Put another way, a Fourth Amendment seizure, standing alone, "does not necessarily constitute custody for *Miranda* purposes."  *United States v. Street*, 472 F.3d 1298, 1309-10 (11th Cir. 2006).  "The Fourth Amendment seizure analysis uses the 'free to leave' test: a person is 'seized' when 'a reasonable person would [not] feel free to terminate the encounter' with the police."  *Id.* at 1310 (quoting *Miller v. Harget,* 458 F.3d 1251, 1257 (11th Cir. 2006)).  "By contrast, a person is in 'custody' for *Miranda* purposes only when there is a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop, . . . does not constitute *Miranda* custody."  *Shatzer*, 559 U.S. at 113 (citation omitted).

Whether a person is "in custody" and entitled to *Miranda* warnings is a "mixed question of law and fact[.]" *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996). "The determination of custody under *Miranda* depends entirely on 'the objective circumstances of the interrogation'" as viewed "from the perspective of the 'reasonable innocent person.'" *Woodson,* 30 F.4th at 1303-04 (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994); *Moya,* 74 F.3d at 1119). "[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant" to the custody inquiry. *Moya,* 74 F.3d at 1119.

In this case, the Magistrate Judge determined that Defendant was not subject to a custodial interrogation by police officers in the airport. (Doc. 58 at 9-10.) Among other facts, the R&R highlights that Defendant "was never placed in any cuffs, handled in any coercive manner, or told he was under arrest." (*Id.* at 9-10.) The Magistrate Judge found that, instead, Defendant "was told, . . . that it was necessary to continue the inspection in the precinct office for safety reasons"[6] and that once "the process was complete, he was

---

[6] The Court sustains Defendant's first objection to the extent it disputes the Magistrate Judge's finding that Defendant was *told* that "the officers conducted the additional inspection at the airport precinct for security reasons." (Doc. 63 ¶ 1.) Upon review of the APD officers' body camera footage, the Court does not find that the APD officers clearly *told* Mr. Houston that they were bringing him to the police precinct to conduct a further inspection

14

simply allowed to leave and continue his journey." (*Id.* at 10.)  The R&R also reasons that "[i]f anything, the testimony suggests that Defendant remained insistent on getting his property back, and was trying to convince the police that the gun lacked a cylinder and thus was no danger."[7]  (*Id.*)

Defendant objects to the Magistrate Judge's R&R on several grounds. (Doc. 63.)  The Court does not recount Defendant's nine independent objections here,[8] but it suffices to say that Defendant objects both to certain factual findings made by the R&R and the R&R's overall conclusion that Defendant was not "in custody" for purposes of *Miranda*. (*Id.*)  For the reasons below, the Court overrules Defendant's objections except for his first objection, *see supra*

for safety reasons.  Instead, they stated that the officers needed to complete some "paperwork."  *See infra* at 16-17.  That said, the Court still credits Officer Hussain's testimony that concern for the safety of other passengers motivated, at least in part, the APD officers' decision to search Defendant's Xbox in a secure police precinct.  Moreover, this objection does not alter the result of the *Miranda* custody analysis for the reasons set forth in this order.

[7] Defendant objects to the Magistrate Judge's finding that he was insistent that officers return his gun.  (Doc. 63 ¶ 4.)  Mr. Houston's subjective motivations are immaterial to whether he was in custody under *Miranda* and the Court does not consider them in its analysis.

[8] Some of Defendant's objections are immaterial to the issues presented by his motions to suppress.  For instance, Mr. Houston objects to the R&R's description of the gun as being "apparently without a cylinder." (Doc. 63 ¶ 3.) Per Mr. Houston, the firearm was "clearly" without a cylinder, not "apparently" without a cylinder.  (*Id.*)  The Court finds that this slight disagreement over verbiage is not material to the motions to suppress and is thus overruled.

15

at 14 n.6, and agrees with the R&R's conclusion that Mr. Houston was not in custody within the meaning of *Miranda.*

As a threshold matter, Mr. Houston was not in custody within the meaning of *Miranda* prior to entering APD's airport police station. At all times before arriving at the station, Mr. Houston was in publicly accessible areas of the airport. Moreover, he was not physically restrained or placed in a police-dominated area. Therefore, Mr. Houston was not in a sufficiently coercive environment to constitute custody under *Miranda.* However, the issue of whether Mr. Houston was subject to a custodial interrogation while he was questioned in the APD precinct presents a closer call. After weighing the totality of circumstances, the Court finds that while Mr. Houston may have been subject to a brief investigative detention pursuant to *Terry v. Ohio,* 392 U.S. 1 (1968), he was not "in custody" for the purposes of *Miranda.*

**Initiation of Interview.** First, the Court considers the manner in which the APD officers at the TSA security checkpoint initially instructed Mr. Houston to accompany officers to the police station. Upon finding the firearm in Mr. Houston's luggage, the unidentified APD officer told him: "Here's the deal, we have another officer coming, they're going to take you down to the precinct to do some paperwork. When they're done, *they're going to release you with your gun.* Okay? You gotta find somewhere to store it or some way to pack

16

it properly and . . . you can come back through. Okay?" (Def's Ex. 3, Unidentified APD officer BWC Footage, Doc. 77-3 at 00:25:30-25:50 (emphasis added).) When Officers Pierre and Hussain arrived at the TSA checkpoint, the unidentified APD officer told them, in front of Mr. Houston, "Y'all do y'all's paperwork. *You release him* with the gun. After that, it's up to him . . . ." (Def's Ex. 1, Ofc. Pierre BWC Footage, Doc. 77-1 at 00:31:05-31:15 (emphasis added).) Officers Pierre and Hussain then directed Mr. Houston to follow them to the station. (*Id.* at 00:31:00-36:30.) In other words, although the APD officers indicated that Mr. Houston would have to go to the police station so that the officers could complete some paperwork, they noted that Mr. Houston would be released following any detention.

***Location.*** Second, the Court considers the location of the questioning. *Woodson*, 30 F.4th at 1303. Although Mr. Houston was taken to APD's police precinct, he was not placed in an office, interrogation room, or holding cell. Instead, Mr. Houston was told to wait on a bench in the lobby of the police station as Officer Pierre sat on a conference table nearby and retrieved the firearm from the Xbox gaming console. Officer Hussain, a TSA Supervisor, and an official from the City of Atlanta's Department of Aviation ("DOA") were also present and appeared to be completing paperwork related to the firearm.

17

The scene in the police station lobby as captured by Officer Pierre's BWC footage is depicted below.



(Doc. 77-1 at 00:37:12.)

The mere fact that Mr. Houston was asked questions inside a secure police station, however, does not automatically render his questioning a custodial interrogation. "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *Beheler*, 463 U.S. at 1125 (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977)). As the Eleventh Circuit has held, being "questioned in a secure facility . . . does not necessarily make the

18

interrogation custodial." *United States v. Muegge,* 225 F.3d 1267, 1271 (11th Cir. 2000); *see United States v. Phillips,* 812 F.2d 1355, 1357, 1362 (11th Cir. 1987) (holding that an individual was not in custody where he was questioned in a police station, but was not placed under arrest, handcuffed, or locked in a room).

***Duration.*** Third, the Court considers the duration of the questioning. *Woodson*, 30 F.4th at 1303. In total, Mr. Houston was present in the police station for approximately 42 minutes, from 12:36 AM to 1:18 AM. (Doc. 77-1 at 00:36:00-01:18:00.) However, he was asked questions only intermittently during that time. For much of that period, the officers were conversing amongst themselves and completing other tasks rather than asking Mr. Houston questions. For example, from approximately 12:38 AM to 12:46 AM, Officer Pierre worked to pry the firearm from the gaming console and remove screws and wires taped to the firearm. (*Id.* at 00:38:00-46:00.) Officer Pierre sporadically asked Mr. Houston questions, such as whether the firearm had sentimental value to him, why he didn't purchase a more functional firearm, and where he purchased the firearm. (*Id.*) Officer Pierre also informed Mr. Houston that he doesn't need a permit to transport a firearm, but simply needs to declare it when checking in. (*Id.*) From approximately 12:51 AM to 1:00 AM, Officer Pierre did not speak to Mr. Houston at all, but rather to a

19

colleague, as well as a supervisor on the phone. (*Id.* at 00:51:00-00:01:00.) During this time, Officer Hussain intermittently asked Mr. Houston questions, such as whether he knew what the make of the gun was and how much money he purchased it for. (Def's Ex. 2, Ofc. Hussain, Doc. 77-2 at 00:51:00-00:01:00.) For the most part, Officer Hussain, the TSA Supervisor, and the DOA officer spoke amongst themselves as they appeared to fill out paperwork.

In short, the Court finds that the duration of Mr. Houston's questioning was not so long as to convert it from a *Terry* stop to a custodial interrogation. *See Muegge*, 225 F.3d at 1269-71 (11th Cir. 2001) (holding that the suspect was not in custody where he was directed by supervisor to speak with investigators at a secure site in an interview room with the door closed and was interviewed for approximately two and a half hours); *United States v. Hardy,* 855 F.2d 753, 761 (11th Cir. 1988) (finding that a detention that lasted approximately fifty minutes was not too long to convert a *Terry* stop into an arrest).

***Statements, Language, and Tone****.* Fourth, the Court considers the "statements made during the interview," *Woodson*, 30 F.4th at 1303, and whether the officers "used language or a tone that indicated that compliance with the officers could be compelled," *Luna-Encinas*, 603 F.3d at 881. To be sure, the APD officers instructed Mr. Houston to accompany them to the police precinct and did not inform him that he was free to leave. Further, throughout

20

the encounter, the APD officers stated their belief that Mr. Houston intentionally concealed a firearm within the gaming console found in his carry-on luggage.  For instance, the unidentified APD officer stationed at the TSA checkpoint told Officers Pierre and Hussain—within earshot of Mr. Houston—that Mr. Houston "tried to hide [the firearm] in the Xbox."  (Doc. 77-3 at 00:27:40-27:50.)  At the police precinct, after removing screws and wires taped to the firearm, Officer Pierre told Mr. Houston that "when you put screws around [the firearm], . . . I can't imagine any other reason for you to have those in there, other than to try and conceal it. You know what I'm saying?"  (Doc. 77-1 at 00:47:30-47:50.)  At another point later in the interview, when Mr. Houston stated that he didn't mean any harm and suggested that he wasn't "the devil," Officer Pierre responded, "I didn't say you were the devil, but it's a federal offense brother."  (*Id.* at 1:05:10-05:35.)  In other words, police officers indicated that they believed that Mr. Houston had committed criminal wrongdoing.

While some of the APD officers' statements were accusatory in nature, as noted above, the fact that an individual is the focus of a criminal investigation does not turn an interview into a custodial interrogation.  *See Beheler*, 463 U.S. at 1124-25; *Muegge*, 225 F.3d at 1270 ("The fact that an investigation has focused on a suspect does not necessarily trigger the need for

Miranda warnings."); *see also Stansbury*, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.").  Rather, the Supreme Court has recognized that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Beheler*, 463 U.S. at 1124 (quoting *Mathiason*, 429 U.S. at 495).  Absent additional indicia of coercion, an individual's status as a criminal suspect does not automatically imply that a person is in custody for purposes for *Miranda.  See Muegge*, 225 F.3d at 1270 (finding that a defendant's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, did not automatically create a custodial situation" (quotation omitted)).

After careful review of the BWC footage submitted by the parties, the Court does not view the APD officers' statements as sufficiently coercive to cross the line from an investigatory detention to a custodial interrogation. Although the APD officers communicated to Mr. Houston that he had committed wrongdoing, they did not suggest to him that he was under arrest or even that they were contemplating an arrest.  To the contrary, from the

beginning of the encounter, the officers indicated that they were going to release Mr. Houston after completing their "paperwork" and took steps consistent with that course of action.  Moreover, the APD officers maintained a calm and conversational demeanor throughout the encounter.  They did not raise their voice, express frustration, or otherwise threaten or intimidate Mr. Houston.  *See Phillips*, 812 F.2d at 1362 (finding significant in the *Miranda* custody determination that there was no evidence that the officers "resorted to physical or psychological pressure of any sort in order to obtain the statements from appellees"); *United States v. Lazarus*, 552 F. App'x 892, 894 (11th Cir. 2014) (noting that Secret Service agents did not "raise their voices or threaten" the defendant in finding that the suspect was not in custody).

***Physical Restraints or Other Force.***  Fifth, the Court considers "the presence or absence of physical restraints," *Woodson*, 30 F.4th at 1303, and whether the officers "touched the suspect" or "brandished weapons," *Luna-Encinas*, 603 F.3d at 881.  As is undisputed, the officers never placed Mr. Houston in physical restraints or otherwise made any physical contact with him.  Nor did the officers brandish their weapons or use any other force.  *See United States v. Barry*, 479 F. App'x 297, 299 (11th Cir. 2012) (concluding that an interview was voluntary and not custodial where the defendant was not threatened or physically detained, the agents never brandished their weapons,

and the defendant was interviewed calmly in a private area, even though a search warrant was being executed at the time of the interview); *Muegge*, 225 F.3d at 1271 (finding that the defendant was not in custody for *Miranda* purposes where he "was interrogated in a secure facility but never placed under arrest or physically restrained in any significant way").

***Release.***   Sixth, the Court considers "whether [Mr. Houston] was released after the interview." *Woodson*, 30 F.4th at 1303.  Consistent with the first APD officer's statement that Mr. Houston would be released following the completion of paperwork at the precinct, the officers released Mr. Houston after they retrieved his firearm from the Xbox gaming console, documented the incident, and asked him questions about his firearm.

***Totality of the Circumstances.***   Weighing the totality of the circumstances, the Court concludes that while Mr. Houston may have been subject to a *Terry* stop within the airport, his brief detention was insufficiently coercive to constitute a custodial interrogation under *Miranda*.  While a reasonable person in Mr. Houston's position may not have felt free to terminate the encounter, as noted above, the freedom-of-movement test is "only a necessary and not a sufficient condition for *Miranda* custody."  *Shatzer*, 559 U.S. at 112.  Here, the circumstances of Mr. Houston's questioning did not

"present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

Although Mr. Houston was taken to a police precinct for further investigation of his belongings, he was not subject to a "restraint on freedom of movement *of the degree associated with a formal arrest*." *Street*, 472 F.3d at 1310 (quoting *Beheler*, 463 U.S. at 1125) (emphasis added).  From the beginning of the encounter, Mr. Houston was told that he would be released and permitted to travel after APD officers completed paperwork related to his undeclared firearm.  He was not placed in an interrogation room or holding cell but rather told to wait on a bench in the lobby of the police precinct.  The duration of Mr. Houston's detention was less than an hour, and Mr. Houston was only asked questions intermittently during that time.  While a reasonable person in Mr. Houston's position would have understood that the APD officers suspected him of committing a criminal offense, the officers displayed a calm and conversational demeanor throughout the encounter.  APD officers never placed Mr. Houston in physical restraints, suggested he was under arrest, or otherwise deployed any force against him.

Alongside those traditional *Miranda* custody factors, the Court also considers that Mr. Houston's brief detention took place at an airport where security concerns are heightened.  *C.f. Lopez-Pages*, 767 F.2d at 778 ("[A]irport

25

security checkpoints, like international borders, are 'critical zones' in which special [F]ourth [A]mendment considerations apply."). Arguably the strongest fact supporting Mr. Houston's position that he was subject to a custodial interrogation is that he was instructed to accompany police officers to a secure APD police precinct within the airport. But the airport context lessens the import of that fact. Given that Mr. Houston was found with a firearm in his carry-on baggage at a TSA security checkpoint—no less, a firearm that appeared to be wedged inside a gaming console—it was eminently reasonable for APD officers to direct Mr. Houston to a secure area away from the public TSA checkpoint to retrieve his firearm and properly document the incident before sending Mr. Houston on his way. Applying "common sense and ordinary human experience[,]" this fact too suggests that Mr. Houston was subject to a reasonable investigatory stop rather than a restraint on par with a formal arrest. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) (recognizing "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest" and noting that "common sense and ordinary human experience must govern over rigid criteria"); *Rosario*, 2011 WL 4404128, at *4 ("An airline passenger with potentially dangerous undeclared items in his baggage is not necessarily in custody just because he is required to enter a room beyond the public area of an airport.").

In sum, while Mr. Houston may have been briefly detained at the airport upon the discovery of his undeclared firearm, the totality of the circumstances show that Mr. Houston was not "in custody" for purposes of *Miranda.* Officers therefore were not obliged to provide him with any *Miranda* warnings.

### 2. Whether Defendant's Statements Were Voluntary

"Even if no *Miranda* violation occurred, the court still must determine that any confessions or incriminatory statements made by a defendant were voluntary in order to admit them at trial." *Lazarus*, 552 F. App'x at 895. In determining whether any incriminatory statements were voluntary, courts "consider the totality of the circumstances" including the accused's education, intelligence, "the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010) (quoting *Waldrop v. Jones,* 77 F.3d 1308, 1316 (11th Cir. 1996)) (cleaned up); *see Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police."). The voluntariness inquiry ultimately directs courts to determine whether a "statement was the product

27

of 'an essentially free and unconstrained choice.'" *Hubbard*, 317 F.3d at 1252-53 (quoting *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989)).

The Magistrate Judge determined that Mr. Houston's statements were voluntary because they "were not based on unconstitutional coercive tactics, torture, threats, or false promises." (Doc. 58 at 10.) Further, the Magistrate Judge noted that "Defendant was briefly asked questions while sitting on a bench in a waiting area, without being cuffed or threatened, and was subsequently allowed to continue his trip." (*Id.*) Defendant generally objects to the Magistrate Judge's assessment of voluntariness, but does not point to any specific evidence supporting his contention that his statements were not voluntary. (Doc. 63 ¶ 8.) Further, Defendant objects to the Magistrate Judge's finding that "[i]f anything the testimony suggests that Defendant remained insistent on getting his property back."[9] (*Id.* ¶ 9.)

The Court agrees with the Magistrate Judge's conclusion that Mr. Houston's statements were voluntary. Although Mr. Houston argues in briefing that the "circumstances during the encounter indicate that Mr. Houston is susceptible to misunderstandings[,]" (Doc. 52 at 13), that is not the

---

[9] This fact, whether true or not, does not alter the Court's voluntariness finding, which rests on the lack of police coercion directed towards Mr. Houston.

standard for determining the voluntariness of statements to police. Defendant has not presented evidence indicating that he lacked education or possessed intellectual limitations. In any event, "coercive police activity is a necessary predicate to a finding that the confession by a person with a low intelligence level is involuntary." *Hubbard*, 317 F.3d at 1254 (quoting *Singleton v. Thigpen*, 847 F.2d 668, 671 (11th Cir. 1988)). For the reasons stated with respect to the *Miranda* custody analysis, the APD officers did not subject Mr. Houston to undue pressure or coercion. On the contrary, they questioned him intermittently for a brief period throughout which they maintained a calm and conversational demeanor. Moreover, officers never restrained Mr. Houston or applied any physical force against him.

As such, the totality of the circumstances demonstrates that Mr. Houston's statements to the APD officers were voluntary. *See, e.g.*, *Bernal-Benitez*, 594 F.3d at 1320 (finding that a defendant's statements were voluntary where he "was questioned shortly after his arrest, the questioning was not particularly long or drawn out, and there [was] no evidence that the agents intimidated him with threats or force"); *Lazarus*, 552 F. App'x at 896 ("[T]he district court did not err in finding that Lazarus's confession was voluntary. Lazarus's confession was made during a brief, non-custodial interview during which she was not subject to any threats and was not

29

physically detained.").  Defendant's motion to suppress statements is therefore denied on this ground.

## IV.    Conclusion

For the foregoing reasons, the Court overrules Mr. Houston's objections to the R&R as to the motion to suppress evidence (Doc. 20), and **ADOPTS** the Magistrate Judge's R&R (Doc. 58) to the extent that it recommends denial of the motion to suppress evidence.  Defendant's motion to suppress evidence (Doc. 20) is **DENIED**.

Further, the Court overrules all but the first of Mr. Houston's objections to the R&R concerning the motion to suppress statements (Doc. 12), and **ADOPTS** the Magistrate Judge's R&R (Doc. 58) to the extent that it recommends denial of the motion to suppress statements.  Defendant's motion to suppress statements (Doc. 12) is **DENIED**.

**SO ORDERED**, this 13th day of July, 2026.

_____
SARAH E. GERAGHTY
United States District Judge

30